IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT COLUMBIA

| | |
|---|---|
| ANGELA R. TOTTY | ) |
| | ) |
| v. | ) Case No. 1:22-cv-00044 |
| | ) |
| HARTFORD LIFE AND ACCIDENT | ) |
| INSURANCE COMPANY | ) |

TO:    Honorable William L. Campbell, Jr., Chief United States District Judge

### REPORT AND RECOMMENDATION

Pending before the Court are cross motions for judgment on the administrative record: (1) Plaintiff's motion (Docket No. 28), to which Defendant responded in opposition (Docket No. 33); and (2) Defendant's motion (Docket No. 30), to which Plaintiff responded in opposition (Docket No. 32) and Defendant replied in support (Docket No. 34). These motions were referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (Docket No. 35).

For the reasons discussed below, the undersigned respectfully recommends that Plaintiff's motion (Docket No. 28) be **DENIED** and Defendant's motion (Docket No. 30) be **GRANTED**.

### I.    BACKGROUND

Plaintiff Angela R. Totty initiated this action against Defendant Hartford Life and Accident Insurance Company under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, for judicial review of Defendant's decision to deny long-term disability ("LTD") benefits under an employee welfare benefit plan ("the Plan") sponsored and maintained by Plaintiff's former employer, Fast Pace Medical PLLC. (Docket No. 1.) Plaintiff was a Plan participant and was covered under Group Policy No. GVL-16008 (the "Policy"), which was issued by Defendant

to the Trustee of the Health Care Industry Group Voluntary Life and Disability Insurance Trust, in which Fast Pace was a participating employer. (*Id.*)

Plaintiff worked as a Patient Collection Specialist for Fast Pace from May 23, 2017 to July 6, 2018. (AR 220.)[1] In that role, she prepared and reviewed billing for insurance claims and was frequently required to communicate verbally on the phone. (AR 219.)

On March 30, 2018, Plaintiff suffered a stroke and subsequently experienced intermittent vocal dysphonia as a result. (AR 220, 521, 592.) In an effort to improve her vocal issues, she underwent speech therapy from the end of 2018 to the middle of 2019, but this did not lead to significant improvement. (AR 196.) She then underwent two operations, a bilateral true vocal fold paralysis in June 2019 and a bilateral true vocal fold injection medialization in January 2020. (AR 197, 868–69.) On April 7, 2019, Plaintiff was awarded Social Security Disability Insurance benefits, with a disability date as of July 6, 2018 and benefits effective January 2019. (AR 975–78.)

In response to the issues with her voice, Plaintiff filed an application for LTD benefits under the Plan. (AR 219.) For purposes of LTD benefits, the Plan included the following relevant definitions:

> **Any Occupation** means any occupation for which You are qualified by education, training or experience, and that has an earnings potential greater than 60% of Your Indexed Pre-disability Earnings.
>
> * * *
>
> **Disability or Disabled** means You are prevented from performing one or more of the Essential Duties of:

---

[1] The Administrative Record and certain Plan documents are filed at Docket Entries Nos. 18-1 to 18-12. Those documents are labeled as "Hartford/Totty" and include pages 1 to 1068. The Court will refer to these documents as "AR" with a page number that corresponds to the "Hartford/Totty" page number.

> 1) Your Occupation during the Elimination Period [180 days];
> 2) Your Occupation, for the 24 month(s) following the Elimination Period, and as a result Your Current Monthly Earnings are less than 80% of Your Indexed Pre-disability Earnings; and
> 3) after that, Any Occupation.
>
> * * *
>
> **Your Occupation** means Your Occupation, as it is recognized in the general workplace, that You were routinely performing prior to becoming Disabled. Your Occupation does not mean the specific job You are performing for a specific employer or at a specific location.

(AR 50–51.)

Defendant approved Plaintiff's application and awarded her LTD benefits from January 3, 2019 to January 2, 2021 "as it was determined she was Disabled from her own occupation requiring frequent vocal communication." (AR 107.) However, in 2020, Defendant initiated a "test change" investigation to determine whether Plaintiff would meet the "Any Occupation" definition. (AR 189.) On May 1, 2020, Defendant asked Plaintiff to complete a questionnaire and work and education history form, and to have her treating physician complete a statement. (AR 287–89.) Around that same time, Defendant obtained medical records directly from one of Plaintiff's treating physicians, Dr. Daniel Sacks, and asked Dr. Sacks to respond to a questionnaire about Plaintiff's "vocational ability." (AR 828–29.) Dr. Sacks opined that, in his professional opinion, Plaintiff was able to talk occasionally; was not able to speak on the phone; was able to speak-signal; would not be able to maintain employment in an occupation requiring verbal communication; and would be able to maintain employment in an occupation that did not require verbal communication. (*Id.*)

In addition, Defendant had a vocational case manager provide an Employability Analysis Report ("EAR"). (AR 145–48.) To create the EAR, the case manager used the Occupational Analysis System ("OASYS") "for the purpose of determining [Plaintiff's] current employability."

3

(AR 145.) This system was adjusted to account for Plaintiff's vocal issues, among other factors that were unique to her functional capabilities, work history, and education history. (AR 146.) In particular, "Talking was adjusted to Never." (*Id.*) The system then identified seven (7) representative viable employment matches: accounting clerk, billing typist, budget clerk, medical voucher clerk, night auditor, routing clerk, and final assembler. (AR 147.) The EAR concluded that Plaintiff had the capacity and work experience to perform any of the seven listed occupations (as well as an additional occupation, "remote customer service/online chat specialist"), and, therefore, "employability" was "positively identified." (AR 147–48.) Based on this information, Defendant informed Plaintiff on September 30, 2020 that benefits would no longer be payable after January 2, 2021 because Plaintiff was no longer "prevented from performing one or more of the Essential Duties" of "Any Occupation" and therefore was no longer disabled under the Plan's definitions. (AR 246.4–246.9.)

In response to Defendant's denial of LTD benefits, Plaintiff appealed the termination decision. (AR 133, 244–45.) Plaintiff opted to submit additional information and Defendant granted her multiple extensions to do so. (AR 228.)

However, in a letter dated June 2, 2022, Defendant upheld its prior termination decision. (AR 226–30.) This decision was based on a consideration of all of the information in the claims file that Defendant previously considered in its initial denial, as well as newly-submitted medical records ranging in date from March 2018 to December 2019 (AR 227–28); a newly-submitted undated ADA form (AR 228); and a newly-submitted "duplicate attending physicians statement" (AR 228). In its denial letter, Defendant stated:

> Based on a comprehensive review of the entire claim file, to include your client's subjective reports, the medical evidence and the opinion of your client's treating providers, The Hartford's Appeal Unit finds the determination to terminate the claim for benefits appropriate as there are no limitations to prevent your client from

4

performing Any Occupation as of January 3, 2021. Your client's treating physician, Dr. Sack has confirmed that your client has no physical restrictions beyond her ability to speak as outlined in the September 11, 2020 response. Multiple occupations were identified within the functionality that your client could perform based on her transferable skills and met the earnings requirement. It is appreciated that your client continues to receive treatment for a diagnosis, there is not a physician supporting restrictions and/or limitations that would prevent your client from performing Any Occupation.

Our appeal review has concluded that your client does not meet the definition of Disability from Any Occupation as of January 3, 2021. As such, the termination of your client's claim for benefits was appropriate and the claim remains closed.

(AR 228–29.) Because Defendant's denial was a final administrative remedy, Plaintiff initiated this lawsuit pursuant to 29 U.S.C. § 1132(a)(1)(B) for judicial review of Defendant's decision.

## II.    LEGAL STANDARD

ERISA establishes a "uniform regulatory regime over employee benefit plans" to "protect beneficiaries of [those] plans while providing employers with uniform national standards for plan administration." *Milby v. MCMC LLC*, 844 F.3d 605, 609 (6th Cir. 2016) (quoting *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004)). ERISA requires "plans to provide certain presuit procedures for reviewing claims after participants submit proof of loss (internal review)." *Heimeshoff v. Hartford Life & Accident Ins. Co.*, 571 U.S. 99, 105 (2013) (citing 29 U.S.C. § 1133; 29 C.F.R. § 2560.503–1 (2012)). When the internal review has been exhausted, a beneficiary can bring an action in federal court under 29 U.S.C. § 1132(a)(1)(B) to recover benefits owed under the plan. *Id.* at 102.

When an ERISA benefits plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, the "arbitrary and capricious" standard of review is appropriate. *Marks v. New Court Credit Group, Inc.*, 342 F.3d 444, 456–57 (6th Cir. 2003). Here, the parties agree that the "arbitrary and capricious" standard of review applies. The parties also generally agree that, when reviewing an administrator's denial of benefits

pursuant to an ERISA plan, the court "may typically review only evidence contained in the administrative record." *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 660 (6th Cir. 2004) (quoting *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 613 (6th Cir. 1998)).

"[T]he arbitrary or capricious standard is the least demanding form of judicial review of administrative action." *Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 658 (6th Cir. 2013) (quoting *Davis v. Ky. Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989)). "A plan administrator's decision will not be deemed arbitrary or capricious so long as it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome." *Id.* (quoting *Davis*, 710 F.3d at 693) (cleaned up). In other words, the court will uphold a benefits determination if it is "rational in light of the plan's provisions." *Id.* (quoting *Jones*, 385 F.3d at 661). Although the standard of review is "extremely deferential," the court does not simply "rubber stamp the administrator's decision." *Jones*, 385 F.3d at 660–61.

### III. ANALYSIS

In her motion and in response to Defendant's motion, Plaintiff asserts that Defendant's denial of benefits was arbitrary and capricious because: (1) Defendant failed to substantively explain why its findings differed from those of the Social Security Administration ("SSA"), which provided her with Social Security Disability Insurance ("SSDI"); (2) Defendant relied on a deficient EAR to determine that Plaintiff could perform or is qualified for the representative occupations; and (3) Defendant had a conflict of interest. (Docket No. 29 at 7–15; Docket No. 32 at 1–6.)

In its motion and in response to Plaintiff's motion, Defendant argues that its decision was not arbitrary and capricious, but was, instead, based on deliberate and principled reasoning and based on substantial evidence because: (1) Defendant properly addressed Plaintiff's award of

SSDI; (2) the EAR properly accounted for Plaintiff's inability to speak and her qualifications; and (3) any potential structural conflict did not taint Defendant's decision. (Docket No. 31 at 9–14; Docket No. 33 at 4–17.)

As detailed below, the Court finds that Defendant's decision to uphold its termination of Plaintiff's LTD benefits was based upon substantial evidence and was neither arbitrary nor capricious.

## A. Defendant's Consideration of the SSA's Award of SSDI

The SSA's determination of disability is not binding on a plan administrator. *Leppert v. Liberty Life Assurance Co. of Boston*, 661 F. App'x 425, 436 (6th Cir. 2016) (citing *DeLisle v. Sun Life Assur. Co. of Canada*, 558 F.3d 440, 445–46 (6th Cir. 2009)). Nevertheless, it "is far from meaningless." *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 294 (6th Cir. 2005). A plan administrator's failure to consider the SSA's finding of disability does not render the plan administrator's decision arbitrary *per se*. *Glenn v. MetLife*, 461 F.3d 660, 667–69 (6th Cir. 2006). Instead, that failure is a relevant factor to be considered when determining whether the decision was arbitrary. *Id.*

If the plan administrator (1) encourages the applicant to apply for SSA disability payments; (2) financially benefits from the applicant's receipt of SSA payments; and then (3) fails to explain why it is taking a position different from the SSA on the question of disability, the reviewing court should weigh this in favor of a finding that the decision was arbitrary or capricious. *Bennett v. Kemper Nat. Svcs., Inc.*, 514 F.3d 547, 554 (6th Cir. 2008) (citing *Glenn*, 461 F.3d at 669). The rationale for this approach is to serve "as a form of quasi-estoppel." *Curry v. Eaton Corp.*, 400 F. App'x 51, 68 (6th Cir. 2010). In other words, a Court should be suspect if a plan administrator encourages an applicant to demonstrate disability to the SSA to lighten the plan administrator's

7

costs, but then finds that the applicant is not disabled under the Plan's definition. *See id.* (quoting *Glenn*, 461 F.3d at 667–68).

The administrative record contains one document regarding Plaintiff's award of benefits from the SSA. (AR 975–78.) That document is an April 7, 2019 letter stating that the SSA found Plaintiff disabled under its rules on July 6, 2018 and that plaintiff was entitled to monthly disability benefits beginning January 2019. (AR 975.) The letter details what the SSA will pay and when; other SSA benefits that Plaintiff could receive; Plaintiff's responsibilities to report certain updates; potential tax consequences; the process to appeal the decision; considerations for the future; resources to assist with an appeal; and where to report fraud. (AR 975–78.) The letter does not state the basis for the SSA's determination that Plaintiff was disabled under SSA regulations. Plaintiff does not reference or point the Court to any other documents in the record concerning the SSA's disability determination.

In its letter denying Plaintiff LTD benefits, Defendant addressed the SSA's grant of benefits to Plaintiff as follows:

> We note that your client has been approved for Social Security Disability (SSD) benefits. However, it is possible to qualify for SSD, but no longer continue to qualify for private long-term disability (LTD) benefits from The Hartford. The standards governing receipt of these public and private benefits are different in critical ways. In determining entitlement to SSD, the Social Security Administration (SSA) measures conditions against a unique set of federal criteria. By contrast, the continuing validity of a claim to benefits under a private LTD policy depends in part on the interpretation of the specific terms in the policy. Therefore, while The Hartford considers the SSA's disability determination as one piece of relevant evidence, the SSA's determination is not conclusive. The LTD policy is a contract that must be consistently enforced according to its terms.
>
> In determining your client's claim, we have carefully considered all relevant medical, vocational, and other evidence, including any SSA determinations or materials your client has provided to us. Medical evidence in the SSA's possession and The Hartford's possession may be different. The decisions may be made with overlapping, but distinct, sets of medical evidence. In addition to medical evidence, The Hartford's decision is also based on vocational and behavioral evidence, which

> the SSA is not required to use in the same way. Based on the evidence contained in The Hartford's claim file we cannot determine the basis of the SSA's determination that your client is disabled under its standards, nonetheless, your client's receipt of benefits from The Hartford is determined under a different definition of Disability than that used by SSA and as set forth in the LTD policy and described in the termination letter.

(AR 229.)

Plaintiff argues that Defendant's decision to deny LTD benefits was arbitrary and capricious because Defendant failed to (1) adequately consider the SSA's findings even though it benefited from those findings, and (2) explain why its findings (that Plaintiff was not disabled under the Plan's definition) differed from the SSA's findings (that Plaintiff was disabled under the SSA's definition). Defendant, on the other hand, argues that its consideration of the SSA's award of benefits was reasonable. The Court agrees with Defendant and, therefore, affords little weight to Defendant's lack of a more comprehensive explanation of the SSA's decision.

As a crucial preliminary matter, Defendant was not able to adequately consider the SSA's findings or to provide a "substantive explanation" for the discrepancy between its decision and the SSA's decision because Plaintiff did not submit information regarding the basis for the SSA's award of benefits to Defendant. Plaintiff provided only one document related to the SSA's decision – the April 7, 2019 letter. (AR 975–78.) This document included no substantive information regarding *why* the SSA granted disability awards to Plaintiff. Instead, it simply stated that the SSA found Plaintiff to be disabled. Defendant was not able to consider the SSA's reasoning or provide a "substantive explanation" for the discrepancy between its decision and the SSA's decision because it did not know the SSA's reasoning.

Based on a review of the administrative record, Defendant had no information before it to suggest that the SSA's disability determination showed that Plaintiff was unable to perform "Any Occupation" as defined by the Plan. *See Leppert*, 661 F. App'x at 436 ("The [SSA's] award letter

does not state the basis for its benefits determination . . . [thus] nothing in the record suggests that the [SSA] determined that Leppert could not perform Any Occupation as that term is used in the Plan."). Put another way, the best that Defendant could do in its decision was "mention" the SSA's determination.

Plaintiff argues that Defendant "appears to acknowledge that it has no idea what medical evidence or what rationale was used by the SSA in determining Plaintiff to be totally disabled" and asserts that this shows that Defendant's decision was arbitrary and capricious. (Docket No. 29 at 9.) Defendant responds by noting that Plaintiff was provided with ample opportunity to inform Defendant about that medical evidence and rationale but failed to do so. (Docket No. 33 at 4–5.)

Defendant is correct. Plaintiff bears the burden of proving her disability under the Plan, which means that she was required to furnish Defendant with supporting evidence. *See Calvert*, 409 F.3d at 289. However, Plaintiff failed to provide Defendant with the SSA's substantive reasoning for awarding disability benefits to Plaintiff, and Defendant was therefore unaware of any explicit findings made by the SSA that it was required to address. *See Leppert*, 661 F. App'x at 437; *Cox*, 585 F.3d at 303. Simply put, Plaintiff may not withhold substantive information from Defendant and then blame Defendant for not having that information.

Other factors show that Defendant's failure to explain the SSA's decision should be given very little weight. For example, the SSA decision was made in April 2019, which was more than three years before Defendant's June 2022 determination. *See Cox*, 585 F.3d at 303. This is important for several reasons. First, the SSA may have reviewed its decision prior to the time that Defendant made its determination. In fact, the April 2019 letter indicates that the SSA reviewed Plaintiff's case in March 2020. (AR 977.) The record contains no information regarding that review. Second, this lapse of time lessens the Court's concern that Defendant encouraged Plaintiff

to seek SSA awards for her disability, but then found her not to be disabled under the Plan. *See Curry*, 400 F. App'x at 69 ("Taking into consideration the quasi-estoppel nature of the rationale at issue, it seems unlikely that a plan would encourage a claimant to apply for Social Security disability benefits, bide its time for six years while paying its own share of disability benefits, and then cut those benefits off for no reason.").

Because a previous SSA disability determination is a factor to be weighed and not evidence of arbitrariness *per se*, the Court considers Plaintiff's SSA benefits determination to be a factor in her favor but accords this factor very little weight when considering whether Defendant's decision was arbitrary or capricious.

**B.      Defendant's Formulation and Reliance on the EAR**

In Plaintiff's motion and response to Defendant's motion, she argues that the EAR is flawed in four ways: (1) a person with her speech issues could not reasonably perform any of the seven representative occupations in the EAR; (2) there is insufficient evidence to show that she could perform or is qualified for any of the seven representative occupations; (3) there are conflicts within the EAR that are not addressed; and (4) there is no evidence to support or explain how the wage data in the EAR was computed. The Court will address each argument in turn.

*First*, Plaintiff contends that each of the seven representative occupations "would require the need for speech beyond simply gesturing with one's hands," and therefore she could not reasonably perform any of them. (Docket No. 29 at 13.) To support this argument, she points to Dr. Sacks's opinion that she cannot maintain employment in an occupation requiring verbal communication, and inversely, can only maintain employment in an occupation that does not require verbal communication. Plaintiff asserts that Defendant provided no opinion to counter that of Dr. Sacks and she states that "[i]n todays [sic] connected world of Zoom meetings and

11

conference calls, there is simply no reasonable way that a person could perform the seven representative jobs without the use of speech." (*Id.*) Plaintiff believes that the Court must follow her "common sense" approach to analyzing the reasonableness of the representative occupations. In short, Plaintiff contends that she could only reasonably perform a job that requires no verbal communication at any time.

In response, Defendant argues that the EAR specifically identified only occupations that accounted for Plaintiff's inability to speak "as a substantial and inherent part of her duties." (Docket No. 33 at 10.) In other words, Defendant focuses on the "essential duty" component of the definition of "Any Occupation" and thinks that Plaintiff's self-ascribed limitation on speech is not as broad as she believes it to be. Defendant further contends that the EAR considered the speech limitation offered by Plaintiff's treating provider, Dr. Sacks. (AR 828–29.) Defendant asserts that Dr. Sacks's opinion established that Plaintiff "could talk sometimes but would not be suited for an occupation in which regular talking was an 'Essential Duty.'" (Docket No. 33 at 11.) Accordingly, the EAR included only occupations that listed "talking" as "never." In addition, Defendant contends that Plaintiff's argument is wrongly based on her own anecdotal experience rather than evidence in the record and on a misreading of Dr. Sacks's opinion.

The Court concurs that the EAR identified occupations that Plaintiff could reasonably perform. The system utilized by the EAR clearly included a limitation that the jobs would "never" require "talking." (AR 146.) Plaintiff's anecdotal or "common sense" argument that these jobs would require talking because "Zoom meetings and conference calls" exist is not enough to overcome the EAR's clear input to return only jobs that do not require talking. Further, the Court is unclear why Plaintiff believes that her communication is limited to "gesturing with one's hands." Plaintiff does not point to evidence in the administrative record to show this limitation. And, as

12

Defendant points out, Dr. Sacks's opinion indicates that Plaintiff is able to speak to some degree, including occasional talking and "speak-signaling." (AR 828.) In other words, although Plaintiff may not be able to speak on the phone and although she could not maintain employment in an occupation requiring verbal communication, she can nevertheless communicate by talking occasionally or by speak-signaling. The EAR's results clearly and reasonably account for Plaintiff's vocal limitations. Accordingly, evidence shows that Plaintiff could reasonably perform any of the seven representative occupations even with her vocal limitations.

*Second*, Plaintiff argues that there is insufficient evidence or explanation in the EAR to show that she could perform or is qualified for any of the seven representative occupations. (Docket No. 29 at 13.) She asserts that the EAR "does not cite any actual data on this point" and relies on a Sixth Circuit opinion for its finding that a plan administrator acted arbitrarily when it relied on the opinion of an in-house vocational expert who "cited no evidence in claiming that [an employer] could accommodate [a claimant's] high rates of absenteeism." (*Id.* (citing *Neaton v. Hartford Life & Acc. Ins. Co.*, 517 F. App'x 475, 487 (6th Cir. 2013)).)

Plaintiff also argues that the EAR does not indicate whether the representative occupations "fall under the 'closest' or even 'good' level of occupations matching Plaintiff's profile." (*Id.* at 14.) As Defendant points out, although Plaintiff does not explicitly state as much, it appears that she is arguing that the EAR, therefore, does not establish that she is "already qualified" for these occupations. In response, Defendant argues that, even if the EAR does not explicitly indicate whether the representative occupations are in the "closest" or "good" match categories, the EAR nevertheless identifies only occupations that would require little to no training. (Docket No. 33 at 14.) Specifically, the EAR removed "'fair' and 'potential' occupations with SVP [Specific

13

Vocational Preparation] higher than 3 . . . as the SVP levels indicated would require additional training or experience." (AR 147.) The vocational reviewer concluded:

> The claimant has the capacity and work experience to perform the occupations noted and identified above. These occupations exist in reasonable numbers in the national economy, use worker traits and habits the claimant possesses [sic] are within her physical abilities as jobs require working with hands such as needed to handle paperwork, computers, or to assemble/handle parts and do not specifically require speaking on the phone as an essential duty. The claimant is noted to be able to speak-signal to convey or exchange information and could opt to use email for communications with management or coworkers if needed in a job requiring computer use.
>
> * * *
>
> The claimant has the capabilities to perform the occupations noted above with minimum training in tools and/or materials.
>
> Employability is positively identified.

(AR 147.) In other words, the representative occupations were selected because they would require Plaintiff to undergo only minimal training, if any.

The Court finds that the vocational reviewer's EAR offered a reasoned explanation to support the conclusion that Plaintiff could perform the representative occupations with her qualifications and abilities. Plaintiff argues that the EAR must cite to "data," but it is unclear to the Court what "data" Plaintiff thinks was needed but omitted. In addition, the Court finds *Neaton* to be distinguishable because the EAR in this instance considered Plaintiff's accommodation by adjusting "talking" to "never" (AR 146) and by removing certain occupations that would require additional training or expertise (AR 147), whereas the vocational expert in *Neaton* did not cite to any evidence to support the conclusion that the claimant's former employer could accommodate the claimant's high rates of absenteeism. *See also Fenwick v. Hartford Life & Accident Ins. Co.*, 457 F.Supp.3d 603, 625 (W.D. Ky. 2020) (distinguishing *Neaton* because the EAR showed that accommodations for claimant's functional capabilities were considered).

*Third*, Plaintiff argues that the restrictions used by OASYS, the system utilized in the EAR, show "potential conflict" with "no explanation as to how the computer program/algorithm addressed these conflicts." (Docket No. 32 at 2.) Plaintiff asks how the "computer program" applied the limitations or restrictions from Dr. Sacks's opinion. She then argues that Dr. Sacks's restrictions "seem non-compatible," though it is unclear if she maintains the restrictions are not compatible with one another, with some part of the EAR, or with something else. Nevertheless, Plaintiff asserts that the EAR reflects this "potential conflict" because all of the representative occupations "require a certain level of verbal communication." She then asserts that this "potential conflict" is heightened because OASYS relies on the Dictionary of Occupational Titles ("DOT"), which does not consider "non-strength physical aspects of occupations," such as vocal abilities. Plaintiff argues that these "non-strength physical aspects of occupations" appear in a different publication.

In response, Defendant contends that Plaintiff fundamentally misunderstands the OASYS software and how the EAR was created. Defendant asserts that the EAR clearly applies the limitations or restrictions from Dr. Sacks's opinion and "expressly provides the worker characteristics" that were used in OASYS to determine whether and which occupations were suitable for Plaintiff. (Docket No. 34 at 2.) According to Defendant, this disproves Plaintiff's argument that the EAR does not consider "non-strength physical aspects of occupations such as vocal abilities." Defendant maintains that the DOT's inclusion or exclusion of "non-strength physical aspects" is irrelevant because OASYS does not rely solely on information from the DOT. In fact, Defendant argues, the EAR also relies on the very publication that Plaintiff cites. Defendant also argues that Plaintiff's statement that all the representative occupations "require a certain level of verbal communication" is not supported by evidence. Instead, Defendant cites to Dr. Sacks's

15

opinion to show that the record contains "substantial evidence" that Plaintiff could talk occasionally and could talk with or signal people to convey or exchange information.

The Court finds Plaintiff's arguments regarding "potential conflicts" to be unavailing. Plaintiff fails to clearly convey how the EAR's explanation of OASYS is not adequate or reasoned. Further, Plaintiff offers no case law to support her theory that the EAR must offer the explanation she believes is required. As Defendant states, OASYS considered Plaintiff's vocal ability and undertook reasonable steps to determine which occupations, if any, she could perform. Any "potential conflict" that the EAR may contain is not enough to overcome the fact that OASYS reasonably determined Plaintiff's employability and the fact that the EAR set forth how OASYS came to that conclusion. Given the "extremely deferential" standard of review, the Court finds that the EAR offers a reasonable explanation to support the conclusion that Plaintiff could perform the representative occupations.

*Fourth and finally*, Plaintiff argues that there is no "clear evidence" in the administrative record to support or explain how the OASYS system in the EAR computed wage data. (Docket No. 32 at 3–4.) To support her argument, Plaintiff cites to *Williams v. Target Corp.*, 579 F. App'x 390 (6th Cir. 2014), and asserts that this matter must be remanded so the plan administrator may complete the factual record with information about wage data computation. In response, Defendant argues that there is, in fact, "clear evidence" to show how OASYS computed wage data, and that *Williams* is, therefore, neither helpful to nor binding on the Court's analysis. (Docket No. 34 at 3–4.)

The Court finds that the EAR clearly sets forth how wage data was computed, and that *Williams* is distinguishable. In *Williams*, the Sixth Circuit examined whether an EAR contained sufficient information regarding the calculation of the median monthly wage for the one job that

it found suitable for the claimant. 579 F. App'x at 391–92. Another district court in the Sixth Circuit helpfully summarized why the *Williams* court found that wage calculation to be problematic:

> First, as the court pointed out, the EAR said that median monthly wage was based on the "Oasys May 2009 median wage data," but as the court pointed out, there was "no further information on how the wage data [wa]s computed." *Williams*, 579 F. App'x at 391. Second, the EAR cited "wage data from both the Census and the Occupational Employment Statistics survey ("OES Survey")," but it was "unclear if and how that data affect[ed] the 'Oasys May 2009 median wage data." *Id.* Third, both the Census data and the OES Survey data analyzed the wages of a category of 106 occupational titles ("First-Line Supervisors/Managers of Office and Administrative Support") but neither set of data analyzed the average wage for the specific job at issue ("Supervisor, Accounting Clerks"). *Id.* at 392. Fourth, the two data sets conflicted in that the Census data showed monthly median wages below the requisite 128% mark and the OES Survey data showed monthly median wages that could exceed it. *Id.* The court further noted that while the district court and parties assumed the EAR's wage estimate was based on Department of Labor data, there was no clear evidence in the administrative record supporting that or otherwise explaining how OASYS computed the wage data. *Id.* And even assuming Department of Labor data was used, the court could not tell whether OASYS looked at wage data for the broader occupational classification of 106 occupational titles, or if it considered wage data specific to the job of "Supervisor, Accounting Clerks." *Id.*

*Fenwick*, 457 F.Supp.3d at 629. The *Fenwick* court then found that the wage calculation in the EAR before it was distinguishable from the wage calculation in the EAR in *Williams* – the former clearly set forth what data it used while the latter failed to clearly explain how the wage data was computed. *Id.* ("Here, by contrast, it is clear that the EAR used Department of Labor data, and it is clear what data the EAR examined. . . . The EAR stated that the median monthly wage was '[b]ased on the 2010 National OES Wage Statistics.'").

Here, the EAR clearly states the monthly mean wage for each of the seven occupations and explains how that wage was calculated:

| Code Occupation Monthly | Mean Wage |
|---|---|
| 216.482-010 Accounting Clerk | $3,510.00 |
| 214.382-014 Billing typist | $3,293.33 |

| | |
|---|---|
| 216.382-022 Budget Clerk | $3,510.00 |
| 214.482-018 Medical Voucher Clerk | $3,293.33 |
| 210.382-054 Night Auditor | $3,510.00 |
| 222.687-022 Routing Clerk | $2,915.47 |
| 713.687-018 Final Assembler, Optical Goods | $2,873.86 |

> Based on the 2018 National OES Wage Statistics, the mean monthly wages for the identified occupations range from $2,873.86/month to $3,510.00/month. The required earnings potential is $1,801.80 /month, and the occupations identifie[d] would meet and/or exceed this amount.

(AR 147.) As set forth above, the EAR clearly states that the monthly mean wage for the seven occupations was "based on the 2018 National OES Wage Statistics." (AR 147.) Just like the EAR in *Fenwick*, there is no confusion as to which data the EAR used in this case. Here, there is clear information on how the wage was computed; the average wage for the seven occupations at issue are clearly set forth; and there is no conflict between data sets because only one data set was used. Further, the mean wage for each of the seven occupations is significantly higher than Plaintiff's required earnings potential. Accordingly, none of the concerns identified by the *Williams* court are applicable to the EAR in this case.

For these reasons, the Court finds that Plaintiff's objections to the EAR do not demonstrate that Defendant's decision was arbitrary and capricious. Based on the available evidence in the record, Defendant made a reasonable conclusion that Plaintiff could work in any of the seven representative occupations. Defendant's determination was therefore the result of a "deliberate, principled reasoning process."

### C. Defendant's Alleged Conflict of Interest

Finally, the Court will address a more minor issue raised by the parties: whether Defendant had a conflict of interest that the Court must consider as a factor when determining whether Defendant's decision was arbitrary and capricious. Plaintiff argues that, yes, this conflict does exist

18

Case 1:22-cv-00044   Document 36   Filed 05/16/24   Page 18 of 20 PageID #: 1283

and must be considered by the Court. Defendant, however, argues that any structural conflict that exists did not taint its decision because no evidence suggests it had an improper motive.

When a plan administrator "is both the payor of any . . . benefits and . . . vested with discretion to determine . . . eligibility for those benefits," this creates an "inherent conflict of interest." *Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 311 (6th Cir. 2010). Such a conflict "should prove more important . . . where circumstances suggest a higher likelihood that it affected the benefits decision." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008). The Court gives greater weight to the conflict-of-interest factor when the claimant "offers more than conclusory allegations of bias." *DeLisle v. Sun Life Assurance Co. of Canada*, 558 F.3d 440, 445 (6th Cir. 2009).

Here, Plaintiff has made general observations that Defendant had a financial incentive to deny Plaintiff's claim and that Defendant performed its own EAR, which Plaintiff argues "served as the exclusive basis for terminating Plaintiff's LTD benefits." (Docket No. 29 at 7.) The Court finds that Plaintiff's general observations are no more than conclusory allegations of bias, and that Plaintiff's argument regarding the EAR is unpersuasive because Defendant relied on evidence beyond the EAR. The Court finds no circumstances indicating a need to give the conflict-of-interest factor significant weight. *See Schwalm*, 626 F.3d at 311–12 (interpreting *Glenn* and finding no conflict of interest where the administrator "provided a thorough review of the record and there [was] no indication that the review was improperly influenced by the inherent conflict of interest").

## IV. RECOMMENDATION

Based on the foregoing, it is respectfully **RECOMMENDED** that: (i) Plaintiff's motion (Docket No. 28) be **DENIED**; (ii) Defendant's motion (Docket No. 30) be **GRANTED**; and, (iii) Plaintiff's claims be **DISMISSED** and final judgment entered in favor of Defendant.

**ANY OBJECTIONS** to this Report and Recommendation must be filed within fourteen (14) days of service of this Report and Recommendation and must state with particularity the specific portions of this Report and Recommendation to which objection is made. *See* Rule 72(b)(2) of the Federal Rules of Civil Procedure and Local Rule 72.02(a). Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Any response to the objections must be filed within fourteen (14) days after service of objections. *See* Federal Rule 72(b)(2) and Local Rule 72.02(b).

    Respectfully submitted,

_____
BARBARA D. HOLMES
United States Magistrate Judge